*In re* SHONG TOON.

*(District Court, D. California.  August 20, 1884.)*

1. CHINESE IMMIGRATION — ACTS OF 1882 — CHINESE LABORER RETURNING TO UNITED STATES—FAILURE TO OBTAIN CERTIFICATE—EVIDENCE.
    In the case of Chinese laborers who left the United States after the law of 1882 went into effect, and before the passage of the law of July 5, 1884, evi-dence tending to excuse their failure to obtain custom-house certificates can-not be received.  The terms of the act of 1884 expressly forbid the reception of any evidence of the right to re-enter other than the certificates required by the law.

2. SAME—CONSTRUCTION OF ACT OF 1884.
    Chinese laborers whose coming to the United States is not suspended by the act of 1884, are (1) those who were in this country at the date of the treaty of November 17, 1880, or have come before August 6, 1882; and (2) those who, having departed after the passage of the act of 1882, shall produce the evidence required by the act of 1884.

*Habeas Corpus.*

*S. G. Hilborn,* U. S. Atty., and *Carroll Cook,* Asst. U. S. Atty., for the United States.

*Thos. D. Riordan,* for petitioner.

HOFFMAN, J. The petitioner in this case is a Chinese laborer who left this state some two months after the law of May 6, 1882, went into operation. He does not produce the custom-house certificate required by that law, nor did he procure one. He seeks to explain and excuse his failure to obtain it by evidence tending to show that on the day of his departure three steamers sailed from this port for China; that the number of passengers on these steamers was very great; that he, together with many others, repaired to the custom-house to obtain certificates; that the applicants were admitted singly, but that, long before he and some others could obtain admittance, the doors of the office were closed, and he and his companions were left to choose between embarking without a certificate or losing their passage money. The district attorney objected to the admission of this testimony. It was received provisionally, subject to the objection.

The question is thus presented whether, in the case of Chinese laborers who left the United States after the law of 1882 went into effect, and before the passage of the recent law of July 5, 1884, any evidence tending to excuse their failure to obtain a custom-house certificate can be received. Under the provisions of section 4 of the recent act of July 5, 1884, it would seem plain that no such evidence could be received. That section provides for the issuance of a certificate to the departing laborer substantially as prescribed in the act of 1882. Its form is modified, however, in some particulars, not necessary here to enumerate. With regard to this certificate the law prescribes in explicit terms: "Said certificate shall be the only evidence permissible to establish his [the laborer's] right of re-entry." Of course, the production of the certificates prescribed by the law of 1884 cannot be exacted of laborers who left the United States before its passage, and who obtained from the custom-house the certificates required by the existing law at the time of their departure. But the clause of the act of 1884 is cited to show the intention of congress to exact of all laborers who should depart after the law went into effect, the production, on their return, of the certificate therein prescribed as the indispensable condition of their right of re-entry. The same policy is observable in the provision of the sixth section with regard to Chinese persons other than laborers, "who shall be about to come to the United States." They are required to obtain a "permission," etc., "of the Chinese government," etc., "which certificate shall be viseed by the diplomatic or consular representatives of the United States," etc. "Such certificate, viseed as aforesaid, * * * *shall be the sole evidence permissible on the part of the person producing the same to establish a right of entry into the United States.*" If these provisions should be deemed to apply to every person other than a laborer who

shall be about to come to the United States, according to the literal terms of the enactment, the position of the resident Chinese merchants who may desire to visit British Columbia, or Mexico, or the Sandwich Islands, is much more unfavorable than that of the laborer; for the latter may obtain a custom-house certificate entitling him to re-enter the United States, while the former can only return on the production of the certificate issued by the "Chinese or other government of which he is a subject, viseed by the representative of the United States."

Congress has unmistakably adopted with respect to Chinese immigration a policy of great rigor, and as the last act was passed but little more than two years after the passage of the act of 1882, that policy cannot be overlooked in determining the true intent and meaning of the earlier enactment. By the treaty of November 17, 1880, it was provided that "*Chinese laborers who are now in the United States shall be allowed to go and come of their own free will and accord,* and shall be accorded all the rights, privileges, and immunities," etc. The rights thus solemnly guarantied by treaty stipulation were recognized and even extended by the act of 1882. The first section of that act provides in general terms for the suspension of the right of Chinese laborers to come into the United States from and after the expiration of 90 days next after the passage of the act. The second section imposes certain penalties on masters of vessels who shall knowingly land Chinese laborers. The third section provides that "the two foregoing sections shall not apply to Chinese laborers who were in the United States on the seventeenth day of November, 1880, (the date of the treaty,) or *who shall have come* into the same before the expiration of ninety days next *after the passage of this act,* and who shall produce the evidence hereinafter required," etc., (referring to the custom house certificates.) During the interval which elapsed between the date of the treaty and August 6, 1882, (90 days after the passage of the law,) large numbers of Chinese laborers came, without hinderance, into the United States, and many departed, of course without obtaining custom-house certificates, for none were by law required. On the return of these latter the question was presented whether the certificate required by the law of 1882 could be exacted of them as a condition of their right to re-enter the United States. We were of opinion that it *could not,* for reasons that appeared, and still appear, to us conclusive and unanswerable: *First,* having been here at the date of the treaty, the right of the laborers to "come and go of their own free will and accord" was guarantied to them by its second article in the plainest and most unequivocal terms. *Second,* this right was recognized by the law of 1882, for they were expressly excepted from the operation of the section of the act which suspended the coming of Chinese laborers.

It was contended by the district attorney that by the law *all* returning Chinese laborers were required to produce a certificate, and we

were asked so to construe it. In other words, we were asked to hold that congress in passing the law had, in effect, said to the Chinese laborers:

"True it is that you were here at the date of the treaty, or have come here within 90 days after the passage of this act, and had the right when you left the United States to go and come of your own free will and accord, but you shall be denied that right unless you have heretofore, and at the time of your departure, obtained a certificate, now for the first time required to be obtained by departing laborers; which at the time of your departure no law authorized any United States official to issue to you; which it was legally impossible for you to obtain; and which, if you had obtained it, would have been wholly invalid for want of authority on the part of the custom-house officers to issue it; and because it would not have been the certificate required by the law we are now passing."

Can it be contended that any court should so construe this law (if such construction could by possibility be avoided) as to impute to congress, when legislating "to execute certain treaty stipulations with China," and while affecting to acknowledge rights secured by the plain language of the treaty, the intention to attach, by retrospective and essentially *ex post facto* legislation, conditions precedent to the exercise of that right which it was impossible to perform, and to enact that the non-performance of those conditions should forfeit the right; and this construction we were asked to give to a law which discloses the most scrupulous solicitude on the part of congress to avoid even the appearance of retrospective legislation, for it provides that the sections prohibiting the coming to the United States of Chinese laborers, not only shall not apply to Chinese laborers in the United States at the date of the treaty, but also to those who might come into the United States before the expiration of 90 days next after the date of the passage of the law, thus protecting from its operation not merely Chinese laborers *in transitu*, but laborers who might leave China before the expiration of a period of time reasonably sufficient for notice of the law to reach that country.

It appeared to us very plain that, by adopting the construction contended for, we should, in effect, accuse congress of gross disingenuousness, or of utter disregard of a treaty stipulation, to the observance of which the national honor was pledged. The only clause in the act which in any degree favored the construction contended for, occurs in the third section, already cited. It will be observed that that section provides "that the two foregoing sections shall not apply to Chinese laborers who were in the United States on the seventeenth day of November, 1880, etc., *and who shall* produce to the collector the evidence hereinafter in this act required," etc. The use of the copulative conjunction "and" seemed to favor the idea that the laborers excepted from the operation of the two preceding sections were those who not only were here at the date mentioned, but who should produce the evidence required. But the considerations I have advanced seemed too strong to be overcome by the existence of a single

word in the text of the law. We attributed its appearance to inadvertence or clerical error. The recent legislation of congress has shown our supposition to have been correct. In the corresponding section of the law of 1884 the word "and" is omitted, and the words "nor, shall said sections apply to Chinese laborers who shall produce," etc., are inserted. The Chinese laborers whose coming to the United States is not suspended by the act are thus clearly divided into two classes: *First*, those who were here at the date of the treaty, or have come before August 6, 1882; *second*, those who, having departed after the passage of the law, shall produce the evidence in the act required. The construction we had given to the act of 1882 must have been known to congress, certainly to the members more especially interested in the bill. The amendment or correction referred to was accepted without objection by the chairman of the committee which reported the bill, and without opposition from any quarter. I cannot but regard this correction of the language of the act of 1882 as an unmistakable legislative affirmance of the correctness of the construction we had given it.

Upon these grounds the judges were unanimously of opinion that the return certificates could not be exacted as a condition precedent to their right of re-entering into the United States of those laborers who were here at the date of the treaty, and who had left the United States before the law of 1882 went into operation, and that the provisions of that law with regard to return certificates did not and were not intended to apply to such laborers.

The rulings of the treasury department on this point have been conflicting. On the twentieth day of July, 1882, the custom-house authorities were instructed that a laborer, who was in the United States at the time the treaty was ratified, but departed without a certificate of identification from the collector of customs, and prior to the time when that office was prepared to issue such certificates, has the right to return *only* on certificate of identity, required by the statute. This instruction is signed by Judge Folger, secretary of the treasury. Whether prepared by him or by a subordinate, we are not informed. The same question appears to have been again presented to the department, and on the twenty-sixth day of October, 1882, further instructions were forwarded to the custom-house authorities. In these instructions the following passage occurs:

"All laws must receive a reasonable construction, and the intent of the legislature in cases of doubtful construction is always to be regarded. It manifestly was not the intention of congress to take away from a Chinese laborer residing in this country at the date of the confirmation of the treaty his right to go and return at pleasure.

"Inasmuch as it is impossible for a Chinese laborer departing from this country before the passage of the act of 1882 to obtain the certificate required by that act, congress could not have intended to deprive him of his right to return for not doing what was impossible.

*      *      *      *      *      *      *      *      *

"It will be understood, of course, that the decision of this department is subject to be overruled by the courts."

It would not be easy to state more compactly the grounds upon which our ruling is based. This instruction is signed by "H. F. French, Acting Secretary of the Treasury." He makes no allusion to the previous instruction, signed by the secretary. If that instruction had been known to him, and supposed to express the deliberate opinion of the secretary, he would scarcely have overruled it, especially without referring to it. This instruction by the acting secretary, being the latest, is accepted by the custom-house as furnishing a rule for its guidance. The ruling of the department is thus seen to be in harmony with the decisions of the courts.

But the claim now set up by the present petitioner is based on wholly different grounds. He does not, nor can he, deny that the law was applicable to him, nor that he was bound to procure a certificate. He left the United States two months after its passage. He asks the court to excuse his non-compliance with the law in consideration of the equitable circumstances which he offers to prove. I am of opinion that the court has no such dispensing power. The terms of the act of 1884 expressly forbid the reception of any evidence of the right to re-enter other than the certificates required by the law. The policy and intent of congress are thus clearly indicated. No excuses for the failure to procure the required certificate in any case can be received. No equitable circumstances can be shown to explain the failure to obtain the certificate, for no evidence of them is "permissible." The peremptory language of the law of 1884 may not be applicable to a case arising under the law of 1882, but the policy and intention of congress, indicated by the former, may justly be received as a guide to the true construction of the latter.

The ruling in this case may seem harsh, as the petitioner may allege that his failure to obtain his certificate was in part caused by the fault of the custom-house officials. But he, on his own showing, was also in fault. He knew, or might have known, that an unusually large number of passengers were about to leave on the three steamers which sailed on the day he endeavored, as he says, to obtain his certificate. It was his duty to make his application seasonably, and in time to allow the customs authorities to discharge their duties under the act. He may, not unjustly, be visited with the consequences of his neglect. But even if the court were not, as I believe, without authority to dispense with the requirements of the act, the exercise of such authority would be highly inexpedient. Admitting that the facts, as offered to be proved in this case, are generally true, yet the only evidence that the petitioner was one of the crowd of 40 or 50 who were unable to gain admittance to the registration office is his own unsupported statement. If the production of the certificate can be dispensed with in his case, the same rule must be applied to every laborer who may choose to swear that he was one of the

crowd. And even after the 40 or 50 who are now said to have composed it are admitted, others might present themselves who would claim the same privilege, either by swearing that the crowd consisted of a much larger number of persons, or that the court had been imposed on by their predecessors, and that the later petitioners were the persons who really composed the crowd. Moreover, if the excuse now offered be accepted, I see not how any other excuse which the fertile ingenuity of these people could invent, or their unscrupulous mendacity permit them to swear to, could be rejected. They could claim that they were prevented by illness from applying for a certificate, or that they were waylaid and assaulted on their way to the custom-house, or that they arrived in the city barely in time to get on board the steamer, and so on indefinitely, through the endless gamut of deceptions which have in so many instances wearied and disgusted the court, but the falsehood of which the district attorney is, in general, from the nature of the case, without the means of exposing.

Where the petitioners have claimed the right to re-enter on the ground that they left the country before the passage of the law, proofs other than by parol of that fact, and that they were here at the date of the treaty, can readily be afforded. Profoundly impressed as I am with the unreliability of Chinese testimony in general, yet the nature of the proofs, always documentary, which I have exacted, leads me to believe that the frauds which have in this class of cases under the restriction act been committed, are insignificant in number. But if the door has now been thrown open to the admission of parol testimony, tending to show some plausible excuse for not having obtained the certificates required by the act, both the court and the law will be at the mercy of Chinese testimony which it would be impossible to morally accept as true, and equally impossible to contradict. I think, therefore, that even if I had the power to exercise any discretion on this subject it would be my duty to refuse to admit the testimony now offered. But believing, as I do, that it is inadmissible under the law, I have no authority to receive it.

The ruling here announced is not new. So long ago as November 14, 1883, *In re Pong Ah Chee*, 18 FED. REP. 527, it was held by this court that a laborer who was here at the date of the treaty, but who departed after the law of 1882 went into operation without having obtained a certificate, could not be permitted to land, notwithstanding that he offered to show that at the time of his departure he was ill and not expected to survive until his arrival in China, and for that reason neglected to obtain his certificate. The principle involved in that ruling is substantially the same as that announced in the present decision, though the circumstances alleged in excuse are entirely different. I think that no other ruling can be made without wholly sacrificing the law to Chinese mendacity. Nor is the rule adopted more harsh than that which prevails in many civilized countries where the passport

system exists. In none of them, it is believed, would any excuse for the non-production of the passport, such as has been offered in these cases, be received.